# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

KEVIN E. MAYS
                    Plaintiff,

vs.

TODD STOBIE, et al,

                    Defendants.

Case No.  3:08-CV-552-EJL

**MEMORANDUM ORDER**

Pending before the Court in the above-entitled matter are the Defendants' motions for summary judgment (Dkt. Nos. 107 and 109).  Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record.  Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this matter shall be decided on the record before this Court without oral argument.

## Factual Background

This case involves two different incidents with the Plaintiff Kevin Mays ("Mays") and law enforcement personnel.  The first incident occurred on December 23, 2006, when City of Lewiston police officers responded to a dispatch call from Angel Harrell who indicated Mays was going to kill himself and that he may be in possession of a firearm.  Officer Rigney responded to the dispatch call and interviewed Ms. Harrell.  Officer Rigney was assisted by Officer Stobie, Sgt. Blair and two Nez Perce County Sheriff's

Deputies Rodriquez and Hildebrand. The officers placed Mays' children in the temporary custody of his girlfriend, Ms. Harrell, and intended to locate Mays to conduct a welfare check on him.

One of the Mays' children received a cell phone call from Mays or Officer Stobie called Mays at the cell phone number provided by the child. Regardless, Officer Stobie talked with Mays who was riding in a cab driven by a friend of Mays. Mays claims he denied on the phone that he was suicidal or had a gun. Officer Stobie does not recall asking Mays prior to the search if he had a firearm. Officer Stobie instructed the cab driver to pull over and let Mays out of the cab at a parking lot by the Lunchbox Deli. The other law enforcement officers and deputies converged on this location. Mays was told over the cell phone by Officer Stobie that upon leaving the cab he should raise his arms to show he was not armed to the officers on the scene. Mays complied. Mays is a large man over six feet tall and weighed over 200 pounds at the time of this incident.

The rest of the stop and the use of force in restraining Mays appears to be contested. The officers claim Mays was approached by Sgt. Blair and instructed to lie down on the ground in a prone position. The officers on the scene indicate Mays initially did not comply, but then did so. Sgt. Blair remembers guiding Mays to the ground and onto his stomach in the prone position.

Mays claims Sgt. Blair ran towards him with his taser drawn. Sgt. Blair agrees he had his taser drawn , but says he holstered his taser when he saw the two sheriff's deputies arrive on the scene as backup. Deputy Hilderbrand admits in his affidavit he had

his taser drawn and was instructing Mays to get on the ground and was the cover officer for Sgt. Blair.

Mays was searched by Sgt. Blair and no gun was found. Mays did tell Sgt. Blair he had a pocket knife which was removed from his person by the officer. Deputy Rodriguez states in his affidavit that he saw a scuffle between Mays and Sgt. Blair while Mays was on the ground in the prone position. Upon seeing the scuffle, Deputy Rodriguez attempted to help Sgt. Blair handcuff Plaintiff. Rodriguez admits he used standard procedure of placing his knee in Mays' back and began pulling on his arm. Rodriguez remembers seeing a taser near his right knee and then Mays suddenly became compliant and was handcuffed. The officers represent they were observing Sgt. Blair search Mays and after Mays appeared to be resisting the officer by not removing his arms from under his body to be handcuffed, the cover officers swarmed Mays and grabbed different parts of his body. That is when Deputy Hilderbrand used a taser in drive stun mode on Mays' back. Sgt. Blair agrees Mays was tased by one of the Sheriff's deputies and that he could not recall a verbal warning about the use of the taser before it was used by the deputy.

Sgt. Blair assumed Mays had a firearm based on the information provided earlier. Sgt. Blair admits he did not find a firearm on Mays. It is unclear to the Court whether the other responding law enforcement officers knew no firearm was found on Mays or whether they still considered him potentially armed when the officers say they swarmed Mays.

Mays claims he was complying with the officers instructions when all of a sudden he was tackled from behind, handcuffed and then searched. Mays claims he was hit with something, but he does not know what it was but that he knows his injuries on his face were from more than just hitting the asphalt. Mays also claims he was beat and kicked by the officers.

The responding officers maintain Mays hit the right side of his head on the ground when the officers swarmed and that no flashlight or beating of Plaintiff occurred. Defendants do not dispute that different officers were holding down Plaintiff and one had his knee in Mays back to restrain him and that Mays was tased in his back by Deputy Hilderbrand who thought Mays might be struggling to get a weapon, so he deployed is taser. Deputy Hilderbrand was a graduate of POST training and received taser training as part of his training to be a law enforcement officer. Deputy Hilderbrand was re-certified on use of a taser on February 7, 2005.

After Mays was restrained and handcuffed he was asked about being suicidal and having a firearm. He denied both allegations. The officers noted a small cut near Mays' right eye. Mays was taken by ambulance to the hospital for medical treatment. Mays was not arrested by any law enforcement officer. Mays was charged by citation with resisting arrest and obstruction of justice. He was not arrested on the charges and was found not guilty of such charges.

The hospital medical records (Dkt. No. 115-17) indicate Mays received stitches for the cut 2.5 cm in length near his right eye, a CT scan of his head and an x-ray of his jaw. There was no evidence of intercranial injury or fracture of the jaw. The medical records

also indicate that Plaintiff informed the medical staff that he was hit on the head and face with a flashlight. The treating medical personnel noted on the medical records the Plaintiff smelled of alcohol and admitted to drinking. Plaintiff informed the doctor he had been diagnosed with a "brain aneurysm" at Tri-State Memorial Hospital some time ago, but the CT scan obtained from Tri-State Memorial Hospital did not show evidence of an aneurysm, but only an area of encephalomalacia (softening of brain tissue) in the left frontal lobe. It is undisputed that Mays suffered two black eyes and other bruising after the incident with law enforcement officers. Mays claims his teeth were also damaged due to the incident.

Mays testified he did not know any of the law enforcement officers prior to the incident on December 23, 2006. Mays alleges the law enforcement officer acted with malice or criminal intent to harm him. None of the responding law enforcement officers claim any prior knowledge of Mays.

Plaintiff claims his eyesight and cognitive abilities were impacted by the alleged excessive force used by law enforcement officers. Defendants' experts claim Plaintiff injured his right side of his face where he received stitches, not the left side and any damage caused to the left side was due to an accident on April 30, 2006 (for which he sought medical treatment on May 2, 2006) when Mays fell off a porch hitting the left side of his head on a truck bumper. That fall caused a sub-dural hematoma and caused Mays vision problems, including but not limited to hair-like lines in his vision, double vision and blurry vision. Defendants experts claim Mays' vision is normal and that other damage to his vision or cognitive abilities is not due to the events on December 23, 2006.

Specifically, Defendant's experts opine that vitreous floaters were caused by a trauma to the left side of Mays' face and that no brain or head injuries occurred as a result of the incident on December 23, 2006. Plaintiff's expert, Dr. Corgiat, does not opine that any closed head injuries were the result of the incident on December 23, 2006.

It is unclear from the record whether the alleged damage to Mays' teeth was caused by this incident or a prior accident. It is undisputed that Mays suffers from some cognitive injuries. It appears disputed whether there is medical evidence to support that the excessive force incident in 2006 is a cause for the cognitive injury sustained by Mays. The medical evidence seems to support that while prior events may have impacted Mays, it was the events of November 2008 that led to the cognitive deficiencies that Mays currently suffers from.

The second incident occurred while Mays was a pre-trial detainee at the Nez Perce County Jail ("Jail") on November 7 -16, 2008. It is undisputed that Mays was lawfully detained at the Jail on charges of stalking, a felony, and a violation of a civil protection order, a misdemeanor. A timeline of the supervision and medical care Mays received while in the custody at the Jail is set forth below and does not appear to be disputed by Plaintiff:

1.  On Friday, November 7, 2008, Detention Deputy Matthew White booked Mays into the jail and asked him medical history questions. Plaintiff did not indicate he had a problem with drug dependency or alcoholism. Plaintiff's statement of facts indicates that Mays suffered from chronic

alcoholism and this fact was known to jail personnel since Mays had been jailed on previous occasions.

2.    Mays appeared before a magistrate judge on November 10, 2008 and the matter was set for preliminary hearing on November 19, 2008.

3.    On Friday, November 14, 2008, Mays woke up at 3:30 a.m. complaining he had been bitten by a snake and that he had a dead snake in his towel. Plaintiff was shown by Deputy Matthew White there was no snake and he was moved to the day room to sleep until wake up at 5:30 a.m.

4.    On Friday afternoon at approximately 1:55 p.m., Deputies Rome and Gunther did cell checks and Mays complained there were bugs in his cell (which he had done three time since 1:00 p.m.). His cell was checked and not bugs were found. Mays made no other complaints on Friday November 14, 2008.

5.    On Saturday, November 15, 2008, at around 1:30 a.m. Mays complained there were cats in his cell that were biting him. Mays requested to go to the hospital to get medical care for the cat bites. Deputy Jody Brown, along with two other deputies, examined Mays and found no indication of injury of any kind. Deputy Brown did observe Mays shaking and combined with the hallucinations, thought he might be detoxing so noted in the jail log he should continued to be monitored.

6.    At 3:00 a.m., Mays became destructive and was throwing books at a jail observation camera and was observed hitting his arm against the table with

some force.  Deputy Brown along with other jailers responded to the destructive behavior.  Plaintiff pushed a hallway gate with such force it bent the gate.  Mays complained of a conspiracy by the jailers to harm him and that bugs were crawling on his body.  Plaintiff was placed in a secure single person cell in order to closely monitor his behavior.  Mays calmed down and at 3:22 a.m. Deputy Brown noted in the jail log that Mays was no longer complaining.  Deputy Brown also noticed Mays' arm which appeared bruised and swollen from when Mays had been hitting the table.

7.  At 8:00 a.m., after the change in the shift of the jailers, Mays started throwing water out of the observation port of his cell.  Deputy Jacob Gunter made contact with Mays and Mays complained of snakes and crabs in his cell and that he thought the jailers were gassing him.  Plaintiff was observed standing on his bed to mess with the overhead light and said he was going to kill himself.  Deputy Gunter immediately placed Mays on suicide watch.  Mays continued ranting.  A Suicide Watch Journal was maintained from 7:51 a.m. on November 15, 2008 until 8:20 p.m. on November 16, 2008.  Every time a jailer walks by the cell, the jailer is to write the date, time, initials and description of inmate's status in the cell.

8.  No further reports of Mays trying to hurt himself were reported in the jail logs, Mays took both lunch and dinner, talked with jailers and stood by the door to his cell.

9. At 10:00 p.m., Deputy Brown returned to work and was concerned about Mays' bruised hand and forearm from the previous day. Deputy Brown contacted the Lewiston Ambulance to have medics examine Mays. Plaintiff was examined by a paramedic and an advanced EMT who determined Plaintiff was very irrational, but had full range of motion with no pain. The medics did *not* make any findings about whether or not Mays was detoxing from any substance. Rather, the medics primary impression was Mays had a behavioral or psychiatric disorder. The medics did not recommend Plaintiff be transported to the hospital for any treatment.

10. Deputy Brown's supervisor was not available, so she consulted with the patrol officers who had responded to the jail Sgt. Kevin Wilson and Deputy Joe Rodriguez. Sgt. Wilson determined Mays should go to the hospital.

11. On Sunday, November 16, 2008 at around 12:15a.m., Mays was transported to St. Joseph Regional Medical Center. Rodriguez informed the hospital staff regarding Plaintiff's alcohol intake which he had observed during the incident in June 2006.

12. Dr. Jay Hunter examined Mays and determined that while Mays was experiencing some hallucinations, he was oriented as to person, place, time and situation. After the physical examination, x-rays were taken which showed his wrist was *not* fractured, a CBC (complete blood count) and a CMP (comprehensive metabolic panel) were ordered and Mays was given 100mg of thiamine IM and discharged back to the jail with instructions to

return for a follow up on Monday, November 17, 2008. Dr. Hunter concluded Mays was probably suffering from alcoholic hallucinosis, but that he did not see overt signs of withdrawal, Mays was not toxic and vital signs were normal.

13. Mays returned to the jail at approximately 1:45 a.m. The jail logs indicate Mays was to return to the hospital on Monday for more lab tests. Mays showered and was returned to cell South One without incident by Deputy Julie Frost.

14. At 2:45 a.m., Deputy Brown observed Mays acting "incoherent.' It was also noted on the watch journal that Mays was still hallucinating and talking to imaginary people. Deputy Brown's shift ended at 8:00 a.m. and Deputy Brown had no further contact with Mays.

15. Deputy Gunter and Deputy Smith worked from 7:30 a.m. to 5:30 p.m on Sunday, November 16th. Deputy Martin and Trainee Deputy Romer worked the swing shift starting at 1:00 p.m. and going until 11:00 p.m. on Sunday. All of these deputies reviewed the jail log entries that had been made since they were last on shift and were aware Mays had been taken to the Emergency Room and was to return for follow up on Monday, but no further medical instructions were communicated to jail personnel..

16. Early Sunday afternoon, Deputy Gunter heard banging coming from Mays' cell. Deputy Gunter checked on Mays and noticed he had a small cut above his eye that had scabbed over so no treatment was necessary.

17. At around 1:40 p.m. Deputy Martin heard yelling and she and Trainee Deputy Romer responded to Mays' cell where they observed Mays hit his head on the wall of his cell and then continually push against the wall. When asked to stop, Mays smiled and keep doing the same actions. Deputies Smith, Gunter and Richardson arrived to assist. Plaintiff continued to yell and hit his head on the wall. There was urine on the floor and Mays claimed someone had urinated on his photos in his cell. The deputies determined that in order to prevent Mays from harming himself, he would be placed in the restraint chair. A mandatory watch was placed on Mays every 10-15 minutes until he is removed from the restraint chair by Deputy Gunter.

18. At 2:12 Deputy Gunter, noticed a cut above Mays' left eye. Mays would not give the deputy information about the cut, but the deputy determined the cut was non-life threatening and appeared to be scabbing over.

19. At 2:30 p.m. Mays had calmed down and had received medical treatment for the cut on above his left eye. Mays' cell had been cleaned. Mays was taken out of the restraint chair, placed back in the South One cell and placed on close custody watch. Close custody watch includes checking on the inmate every 15minutes. Mays was checked regularly throughout the day by the deputies as evidenced by the Suicide Log.

20. At approximately 3:00 p.m. Deputy Smith observed Mays bang the door with his hand, but he was not injuring himself. A laceration to the left

eyebrow and left hand were treated with alcohol swabs, antibiotic ointment and bandaged. At 3:16 p.m., Mays was no longer banging his hand against the door and was standing in his cell.

21.     At 5:30 p.m. when Deputies Smith and Gunter went off duty, neither had observed any other incidents with Mays since he had been released from the restraint chair.

22.     Plaintiff was observed by jailers to be sitting on his bunk or standing in his cell and at times was talking to himself.  Mays declined dinner at around 5:30 p.m., but did drink three glasses of Kool-Aid provided by Deputy Gabe Richardson at 6:30 p.m. "to help with DTs and to keep hydrated."

23.     At 8:03 p.m., Deputy Richardson observed Mays sitting on his bunk.  At 8:15 p.m., Deputy Richardson checked on Mays and discovered him sitting on the toilet with a large cut on his forehead.  Other deputies were called to assist.  An ambulance was immediately called and Mays was transported back to the hospital by medics.

24.     Plaintiff was diagnosed with acute tentorial subdural hemotoma (internal bleeding in the brain) and was air-lifted to Spokane for further medical treatment.

25.     Plaintiff's expert Mark Corgiat, Ph.D, opines the subdural hemotoma in November 2008 would have been contributory to some reduction in cognitive ability.  Dr. West, Kootenai Count Coroner, opines the injuries

Mays sustained while in the custody of the Jail significantly contributed to his present mental status.

Plaintiff alleges his loss of cognitive abilities is due to the deliberate indifference by the identified jailers. It is undisputed that medical evaluations of Mays indicate that he has suffered some cognitive losses. Furthermore, it appears the evaluating doctors believe the self-inflicted injuries to Plaintiff's head contributed to the cognitive losses.

Plaintiff's expert opines placement in restraint chair was unacceptable while Plaintiff suffered Delirium Tremens or severe alcohol withdrawal. Some of the jailers believed Mays was detoxing and indicated the same in their jail notes. The jail supervisor, Jack McGee, testified that he is generally aware of DT and that it can be a serious medical situation. McGee was not working at the time of the second incident and also indicated that the Jail has many inmates who are coming off of or down from drug or alcohol usage while they are in jail.

Mays filed his Complaint, Dkt. No. 1, on December 19, 2008. An Amended Complaint was filed on November 20, 2009, Dkt. No. 29. In the Amended Complaint, Mays claims he seeks money damages and declaratory relief pursuant to the Fourth, Eighth, and Fourteenth Amendments and under the common law of the State of Idaho and the Idaho Tort Claims Act. Specifically, Mays claims Defendants unlawfully arrested, assaulted, battered, used excessive force and exhibited deliberate indifference to the serious medical needs of Mays violating his Fourth Amendment and the Due Process Clause of the Fourteenth Amendment. Moreover Mays claims the statutes, regulations, ordinances, policies and procedures, customs and usages of the City of Lewiston ("City")

and Nez Perce County ("County") proximately caused the alleged acts and omissions giving rise to the deprivation of Plaintiff's rights. Defendants deny the allegations and seek summary judgment on all causes of action.

## Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Material facts are those which may affect the outcome of the case. *See id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, *id.* at 255, and the Court must not make credibility findings. *Id.* Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th

Cir. 1988). In addition, the Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show by "affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324. However, if the court is presented with a purely legal question, the court does not defer to the non-moving party.

**Analysis**

**1. 42 U.S.C. § 1983 Civil Rights Actions**

Congress has created a cause of action against private individuals who, while acting under color of law, violate the constitutional rights of private citizens. 42 U.S.C. § 1983 provides in pertinent part:

> Every person who, under color of any statute, […] subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivations of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured.

*Id.* In order for a plaintiff to prevail on a § 1983 claim they must show that (1) the actor that deprived them of their rights acted under color of law and (2) that the action actually deprived them of a constitutional right. In this case (1) is not disputed by either of the parties. Police officers carrying out their duties act under color of law. Mays contends that the constitutional rights which were violated in this case are the right to be free from excessive force incident to arrest and deliberate indifference to his medical needs on the part of the Nez Perce County Jail deputies.

While § 1983 provides a cause of action against police officers for constitutional violations that they might have committed, they are also entitled to qualified immunity from § 1983 claims. Qualified immunity operates to "shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with law." *Pearson v. Callahan*, 129 S.Ct. 808 (2009). The court in *Pearson* rejected the mandatory two-step approach that it had announced in *Saucier v. Katz*, 533 U.S. 194 (2001). *Id.* at 818. That approach had required courts to first decide if the defendant's "conduct violated a constitutional right" then decide whether the right was clearly established at the time of the alleged violation. *Saucier*, 533 U.S. at 201. Courts are now free to decide either question in whatever order is most appropriate given the circumstances. The Court is satisfied that the rights Mays claims were violated are guaranteed by the federal Constitution. Any reasonable government actor would have shaped their conduct to preserve them. What is at issue is whether they were violated. Whether the rights were violated, and thus whether the officers were entitled to qualified immunity, is an appropriate question for summary judgment since the doctrine, if applicable, confers

immunity from the suit itself. *Pearson*, 129 S.Ct. at 815 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).).

## 2. Wrongful or False Arrest or False Imprisonment

A claim under § 1983 for false arrest or false imprisonment is grounded in the Fourth Amendment guarantee against unreasonable seizure. *Dubner v. City and County of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001). To maintain false arrest claims under § 1983, a plaintiff must show that the arresting officer lacked probable cause to make the arrest. *Id.* at 965. "Probable cause exists when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime." *Id.* at 966 (citing *United States v. Garza*, 980 F.2d 546, 550 (9th Cir. 1992)). A false arrest claim under § 1983 will fail if there was probable cause to arrest for at least one of the offenses involved. *Johnson v. Knorr*, 477 F.3d 75 (3d Cir. 2007).

False arrest can also be a state-law tort claim. In *Clark v. Alloway*, 170 P.2d 425, 428 (Idaho 1946), the Idaho Supreme Court defined "false imprisonment" as "'the unlawful restraint by one person of the physical liberty of another,' or more exactly, 'the direct restraint by one person of the physical liberty of another without adequate legal justification' or without probable cause" (quoting, 11 R.C.L. 79).[1] In Idaho, "[a]nyone who aids or assists in procuring a false imprisonment is equally liable in damages with

---

[1]R.C.L." is an abbreviation for *Ruling Case Law*, the predecessor to *American Jurisprudence*, the legal encyclopedia.

the one who actually places the person falsely imprisoned under restraint." *Harkness v. Hyde*, 176 P. 885, 887 (Idaho 1918).

Any claim for unlawful arrest must be dismissed as it is undisputed Mays was not arrested for any crime. Mays did receive a citation for resisting arrest, but based on the facts presented, he was not falsely imprisoned or arrested on the citation so no violation of his constitutional rights occurred. It is undisputed by Plaintiff's own expert that the officers had probable cause to conduct a community care-taking welfare check on Mays after they received the phone call from his girlfriend and she indicated he was potentially suicidal and in possession of a firearm. Accordingly, any claim for false arrest on false imprisonment must be dismissed as a matter of law.

### 3. Excessive Force

#### A. Standard

The appropriate area of inquiry for a claim of excessive force incident to an arrest or detention is the reasonableness test of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The Supreme Court has directed the excessive force inquiry into "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397.

When weighing an excessive force claim, summary judgment is appropriate if the Court "concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under all circumstances." *Scott v.*

*Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Alternatively, "the court may make a determination as to reasonableness where, viewing the evidence in the light most favorable to [the plaintiff], the evidence compels the conclusion that [the officers'] use of force was reasonable." *Hopkins v. Andaya*, 958 F.3d 881, 885 (9th Cir. 1992). The Court can therefore find summary judgment if the force the officers used was appropriate in any circumstance, or if the circumstances in the specific case were such that the only conclusion is that the force was reasonable.

The Ninth Circuit, in *Miller v. Clark County*, 340 F.3d 959 (9th Cir. 2003), has developed a three step analysis for excessive force claims. First, the court assesses the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted. *Id.* at 964. Second, the court assesses "the importance of the government interests at stake" by evaluating the factors set forth in Graham: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. Third, the court considers the totality of the circumstances and weighs the gravity of the intrusion against the government's interest to determine whether the force employed was constitutionally reasonable. *Miller*, 340 F.3d at 964.

It should be noted that the "inquiry is not limited to the specific Graham factors, . . . [the court] must look to whatever specific factor may be appropriate in a particular case, whether or not listed in Graham, and then must consider 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Franklin v. Foxworth*, 31 F.3d 873,

876 (9th cir. 1994) (quoting *Graham*, 490 U.S. at 396). The Ninth Circuit has indicated in some cases the availability of alternative means in subduing the plaintiff should be fourth factor considered by the court. *See Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005).

While considering this question the Court must be cognizant that "all determinations of unreasonable force "must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."" *Henrich*, 39 F.3d at 914 (quoting *Graham*, 490 U.S. at 396-97). In addition, a plaintiff can succeed on an excessive force claim only if they have suffered some compensable injury as a result of their treatment. *Graham* 490 U.S. at 394. The question of qualified immunity "in excessive force cases is the same as the test on the merits." *Lalonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000) (citing *Katz v. United States*, 194 F.3d 962, 968 (9th Cir. 1999).

In the present case, Mays contends the individual defendant officers used excessive force when restraining him to search and handcuff him when he was not being arrested for a crime. The *Graham* standard requires the Court to weigh the interests of the officers in enforcing the law and providing for their own safety against the individual's right to be free from intrusive and excessive force. *Graham*, 490 U.S. at 396. The Ninth Circuit cautions that because "such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom […] summary judgment or

judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) (citations omitted).

B. Application to Facts

For the purposes of this analysis, the Defendant Officers and Deputies are Todd Stobie, Mike Rigney, Donald Blair, John Hilderbrand, and Joe Rodriquez because they are the only law enforcement officers who were involved in the first incident. The Court is aware Mays also claims municipal entity liability for the City and County on this claim. Municipality liability will be discussed in a separate section of this Order.

Plaintiff's Expert Captain David Neal, Ret., opines that the officers could have handled the situation differently to avoid injury to Mays, the officers used excessive force and there was not proper supervision of the law enforcement officers to make sure policies were correctly applied. The Court is concerned with what actions *actually* occurred than what actions are deemed reasonable applying 20/20 hindsight after the fact to say the injury to Mays could have been avoided. Officers have to make split second decisions and this Court will evaluate what a reasonable officer should have done under the totality of the circumstances. While it would have been preferable for all the responding officers to have known that no weapon was found when Sgt. Blair searched Mays, it appears this information was not communicated to Deputy Rodriguez and Deputy Hilderbrand who still believed Mays could be in possession of a firearm when they observed a scuffle with Sgt. Blair and swarmed Mays. This of course, is in direct conflict with Mays' testimony he was tackled and beaten.

The gravity of the situation clearly required law enforcement intervention. The call to dispatch suggesting Mays was suicidal and in possession of a firearm are serious allegations that are priority one for law enforcement to investigate and conduct a welfare check on a member of the community. In evaluating the importance of the governmental interests at stake, the Court finds the severity of the crime is arguable. There is no evidence Mays was committing a crime at the time officers confronted him. However, the government has a significant interest is preventing persons from committing suicide. Whether Plaintiff posed a immediate threat to the safety of the officers or others is also disputed. There were at least five officers who responded to the incident in the parking lot. Officer safety was a significant concern since the responding officers believed Mays was in possession of a firearm and was suicidal. Mays argues the threat was minimal as he was compliant with the officers and informed them he did not have a weapon or want to kill himself and after the search it was known that he did not have a firearm. It is also disputed as to whether or not Mays was actively resisting. The officers claim he was resisting pulling his arms from under his body to be handcuffed which they interpreted as a possible motion of reaching for a weapon, so they claim in their viewpoint Mays was resisting. Mays claims he did not resist and was tackled from behind and kicked and beaten for no reason. Mays also argues the fourth factor of availability of alternative means of subduing Mays should have been attempted by the officers before they resorted to restraining him with physical force and the taser. Finally, in applying the third factor, the Court finds in considering the totality of the circumstances and the gravity the intrusion, genuine issues of material fact exist which will require the fact finder to weigh

credibility and make a determination of what most likely occurred on December 23, 2006 and whether the conduct by law enforcement officers rises to the level of a constitutional violation for excessive force. Additionally, the extent and nature of any damages related to this incident is disputed. Therefore, summary judgment must be denied on this claim as to the specific law enforcement officers that were involved in the search and handcuffing of Mays. The Court declines to reach the defense of qualified immunity for the officers until a determination is made of whether or not a constitutional violation occurred.

### 4. Alleged Deliberate Indifference of Medical Needs Incident

A. Standard

To state a claim under § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

Although the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment's protection against cruel and unusual punishment, applies to pretrial detainees, *Bell v. Wollfish*, 441 U.S. 520, 537 n. 16 (1979), the same legal standard applies in both circumstances claiming deliberate indifference to medical needs. *Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010) (*citing Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1243-44 (9th Cir. 2010) (rejecting the contention that mentally ill pretrial detainees are entitled to greater protection under the Fourteenth

Amendment). "We have long analyzed claims that correction facility officials violated pretrial detainees' constitutional rights by failing to address their medical needs (including suicide prevention) under a 'deliberate indifference' standard." *Clouthier,* 591 F.3d at 1241. Therefore, the Court, like the parties , will cite to Eighth Amendment cases for the applicable law in this case.

To prevail on an Eighth Amendment claim regarding prison medical care, Plaintiff must show that prison officials' "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)). The Supreme Court has opined that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.*

> The Ninth Circuit has defined a "serious medical need" in the following ways: failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain; . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller,* 104 F.3d 1133 (9th Cir. 1997).

Deliberate indifference exists when an official knows of and disregards a serious medical condition or when an official is "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and actually draws such an inference. *Farmer v. Brennan,* 511 U.S. 825, 838 (1994). Differences in judgment between an

inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim.  *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment deliberate indifference.  *Broughton v. Cutter Lab*, 622 F.2d 458, 460 (9th Cir. 1980).  A mere delay in treatment does not constitute a violation of the Eighth Amendment, unless the delay causes serious harm.  *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990).  If the defendants are able to show that medical personnel have been "consistently responsive to [the inmate's] medical needs, and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," a plaintiff's claims may be dismissed by summary judgment prior to trial.  *Toguchi v. Chung*, 391 F.3d 1051, 1061 (9th Cir. 2004).

The Constitution does not provide a right to a specific treatment.  *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her.").  A prison doctor's recommendation for a less costly treatment is not deliberate indifference unless the recommendation "was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998).

In *Estelle v. Gamble, supra,* Inmate Gamble suffered a back injury at work when a 600-pound bale of hay fell on him. Doctors and other medical providers at the prison prescribed rest and a variety of medications, including different pain relievers and muscle relaxers. Gamble argued that the medical providers were deliberately indifferent because they should have done more to diagnosis his back problem, such as x-raying his back. The Court disagreed, reasoning:

> Gamble was seen by medical personnel on 17 occasions spanning a 3-month period: by Dr. Astone five times; by Dr. Gray twice; by Dr. Heaton three times; by an unidentified doctor and inmate nurse on the day of the injury; and by medical assistant Blunt six times. . . . The doctors diagnosed his injury as a lower back strain and treated it with bed rest, muscle relaxants and pain relievers. Respondent contends that more should have been done by way of diagnosis and treatment, and suggests a number of options that were not pursued. The Court of Appeals agreed, stating: "Certainly an x-ray of (Gamble's) lower back might have been in order and other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing." 516 F.2d, at 941. But the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court under the Texas Tort Claims Act. The Court of Appeals was in error in holding that the alleged insufficiency of the medical treatment required reversal and remand. That portion of the judgment of the District Court should have been affirmed.

429 U.S. at 97-98.

Similarly, in *Toguchi v. Chung*, *supra*, the Ninth Circuit underscored the difference between medical malpractice, which is not actionable under the United States Constitution, and deliberate indifference. Particularly, a plaintiff must show that the medical providers subjectively had knowledge of a serious risk to the plaintiff, and chose

to disregard that risk.  In *Toguchi*, Dr. Chung had treated Inmate Toguchi several times in the past before his untimely death in prison.  The final time she treated him, she prescribed a course of medication that expert witnesses for the plaintiffs (Toguchi's surviving parents) opined caused a toxic level of drugs in his bloodstream, causing his death.

The Ninth Circuit, however, rejected the plaintiffs' expert witness opinions that the treating physician, Dr. Chung had been deliberately indifferent. To reach this result, the Court focused particularly on what Dr. Chung *knew* and *believed* before her allegedly wrongful acts or omissions.  In response to an argument that Dr. Chung should have considered the prescription drug Cogentin an excessive risk to the deceased inmate's health, the Court opined: "Because she did not *believe* that Cogentin use presented a serious risk of harm to Keane, her conduct cannot constitute deliberate indifference."  *Id*. at 1058 (emphasis added).   Similarly, the Court noted,

> It does not matter whether Dr. Chung's assumptions and conclusions were reasonable. Rather, *so long as she was not subjectively aware of the risk* that Keane could be suffering from a drug overdose, and disregarded that risk, she was not deliberately indifferent. *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

*Id*. at 1060 (emphasis added).  Summary judgment for Dr. Chung was thus appropriate.

With the foregoing legal standards in mind, the Court now reviews Defendants' pending motion for summary judgment on the alleged deliberate indifference to a serious medical need claim.

B.  Application to Facts

While the Court recognizes that Mays has suffered some level of diminished mental status as a result of his self-inflicted injury while incarcerated at the Jail, the question for this Court is one of *legal* liability for the alleged injury.  As stated above deliberate indifference involves both a serious medical condition and the official being aware of facts from which the inference could be drawn that a substantial risk of harm exists *and* the official actually draws such an inference. *Farmer v. Brennan*, 511 U.S. 825, 838 (1994). Normally, deliberate indifference claims are filed against medical providers, but here the claim is against the jailers and the County. The Plaintiff cites the Court to *Conn v. City of Reno*, 591 F.3d 1081 (9th Cir. 2010), for the proposition that failure to prevent an inmate's suicide presents factual questions that require a jury determination.  The Court has reviewed the case and finds the cited case sets forth the correct legal standard, but is substantially different from a factual perspective.

First, it should be noted that *Conn* was a panel decision in which an en banc hearing was denied and the case was appealed to the Supreme Court.  The Supreme Court granted a writ of certiorari and vacated the judgment and remanded the case for further consideration in light of *Connick v. Thompson*, 563 U.S. ___ 131 S.Ct. 1350 (2011). *See City of Reno, Nevada v. Conn*, ___ U.S. ___, 131 S.Ct. 1812 (2011). *Connick* dealt primarily with municipality liability for failure to train which was also at issue with the deliberate indifference to a medical need in *Conn*.  Therefore, it is a bit unclear what portion of the Ninth Circuit opinion is still valid as precedential value to this Court since the Ninth Circuit has not issued a new opinion in *Conn* as a result of the remand.

Second, the facts in *Conn* involved arresting officers who failed to disclose prior suicidal statements and actions by an inmate that later committed suicide while a pretrial detainee. Here, the jailers were not made aware of Mays alcohol dependency when he was booked, but did take action immediately to put him on suicide watch as soon as he made statements about wanting to kill himself. The record also shows the jailers sought medical treatment for Mays even after medics did not recommend further treatment.

Third, the critical issue in the case at bar is whether there is a genuine issue of material fact regarding whether the jailers, with limited medical training, actually made the requisite subjective inference that a substantial risk of harm existed. Deliberate indifference analysis which requires an objective risk of harm and a subjective awareness of the harm, so the *Conn* court analyzed the requirements of serious medical need, indifference to that need, and harm caused by that indifference. *Conn* at 1095. This Court will do the same.

A. Serious Medical Need

For purposes of the motion for summary judgment, the Court will assume a withdrawals from alcohol dependence *can* rise to the level of a serious medical need. The jailers involved as well as the jail supervisor, Lt. McGee, acknowledge that alcohol withdrawal can be a serious medical condition. Moreover, there is no dispute that the self-inflicted injuries discovered at 8:20 p.m. on November 16, 2008, were serious and demanded immediate medical care.

B. Was Defendants' response to the medical need deliberately indifferent?

"To demonstrate this second prong- deliberate indifference-plaintiffs must show that the officers were (a) subjectively aware of the serious medical need and (b) failed to adequately respond." *Id.* Thus, the question becomes were the jailers *subjectively* aware of a serious medical need? "To be liable under the Eighth Amendment for denial of medical treatment to a detainee, an official must "know'[ ] of and disregard [ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Conn* at 1096 citing *Farmer*, 511 U.S. at 834, 837. Therefore, even if the deputies had the subjective knowledge of a substantial risk, did they also draw the inference more medical care should have been provided. The Court finds the answer to both these questions is no and that Plaintiff has failed to carry his burden of establishing a genuine issue of material fact as to the jailers' subjective knowledge.

It is undisputed that some of the jailers believed Mays to be detoxing while he was in the jail and the other jailers were on notice of that belief when they reviewed the jail logs when the came on duty. It is also undisputed that many inmates at the Jail are often coming off drugs or alcohol while incarcerated at the jail. But knowledge of the potential of alcohol withdrawals does not in itself create a serious medical risk and no jailer has indicated he or she thought Mays presented a serious medical risk.

The undisputed evidence establishes the jailers, against the medical advice of the responding medics, took Mays to the hospital after he had been hitting his hand/forearm on a table. The jailers also treated minor injuries Mays inflicted on himself after he

returned from the hospital.  The jailers also placed Mays on suicide watch from November 15, 2008 at 7:51 a.m. until November 16, 2008 at 8:20 p.m. as soon as he made any statement about wanting to kill himself.   Mays' status was regularly checked by jail staff.

It is also undisputed that the medical personnel at the hospital were aware that Mays had an issue with alcohol and was having hallucinations.  Dr. Hunter determined Mays may have been suffering from hallucinosis (alcohol-related psychosis which is a complication of alcohol withdrawal).  However, Dr. Hunter found Mays did not present overt signs of withdrawals, was not toxic, and his vital signs were normal.  The treating doctor at the hospital did not inform the deputies who transported Mays to and from the hospital of any potential serious risk of medical harm when they released Mays back to the care and custody of the deputies.  Dr. Hunter merely instructed the jailers to return Mays to the hospital on Monday for follow up on his blood work.  Therefore, the medical examiners provided no information upon which the jailers could subjectively determine a serious medical risk existed.

The Court acknowledges inferences can be drawn from circumstantial evidence to conclude an official knew of a substantial risk if the risk is "obvious."  *Conn* at 1097.  But here, Mays' conduct was not unlike other inmates who are not happy to be in jail and he seemed to calm down after his outbursts, he took his meals or hydration and accepted medical treatment for minor injuries he suffered.  The minor injuries suffered after returning from the hospital (and before the severe head injuries at 8:20 p.m.) did not create an inference of an "obvious" serious medical risk as they were treated with

antibiotic ointment and bandages. Just because an inmate is suffering from alcohol withdrawals does not mean the inmate presents a serious medical need. By checking on Mays regularly, the jailers could determine if and when a serious medical need arose. The jail log does not indicate any of the jailers believed Mays' conduct on November 16, 2008 rose to the level of presenting a serious medical need that required medical attention prior to 8:20 p.m.

While Plaintiff's expert takes exception to the placement of Mays in the restraint chair to prevent him from hurting himself, the placement of Mays in the restraint chair for less than an hour was at the most negligent behavior on the part of the jailers and does not rise to the level of deliberate indifference. Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights. *Toguchi v. Chung*, 391 F.3d 1051 (9th Cir. 2004). Furthermore, the placement in the restraint chair seemed to calm Mays down to the point the jailers felt Mays could be removed from the restraint chair and not hurt himself or continue to act out.

Here the Defendants have shown in the undisputed jail records and affidavits of the deputies involved that the jailers were consistently responsive to Mays medical needs and there has been no showing that the jail personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury." *Toguchi v. Chung*, 391 F.3d 1051, 1061 (9th Cir. 2004). It should be noted that Plaintiff does not create a genuine issue of material fact regarding chronological order of events based on the jail logs, hospital treatment records, or deputies' affidavits. Plaintiff does argue that based on the prior arrests of Mays, the Jail should have been aware of Mays' alcohol dependency and

should have treated his withdrawal with more medical treatment to avoid the injuries, but absent the presentation of the subjective knowledge that a substantial risk of serious harm existed prior to 8:20 p.m. on November 16, 2008, and that the deputies drew the inference of a substantial risk, there is no duty to provide additional medical treatment.

The jail logs show there was no failure to respond to Mays' needs by the jailers. The jail log reflects what conduct was being observed and what actions were taken to protect Mays from harming himself. He was regularly checked, he was provided medical treatment for injuries, his behavior was compliant after being removed from the restraint chair. Therefore, as a matter of law Plaintiff has failed to set forth facts that create a genuine issue of material fact that the jailers were *subjectively* aware of a serious medical need and failed to adequately respond.

Jailers have limited medical training and "prison officials are entitled to rely on the opinions, judgment, and expertise of prison medical personnel in determining the course of treatment that is medically necessary and appropriate for an inmate." *Wynn v. Mundo*, 367 F.Supp. 2d 832, 837-38 (D. N.C. 2005). Moreover, the jailers were actively observing the conduct to Mays to make sure he did not present a serious medical need or harm himself. The fact that he did harm himself in the 15 minute window between checks by jailers does not indicate subjective deliberate indifference on the part of the jailers. Rather the regular checks and medical attention provided indicates deliberate concern for the well-being of Mays.

Unfortunately, Mays did hurt himself during the short time frame between checks, but there is no evidence that the jailers subjectively knew of substantial medical risk to

Mays prior to 8:20 p.m. and deliberately ignored it.  Rather, the jailers were aware Mays

was detoxing and checked on him regularly and gave him medical treatment when

necessary for in injuries he sustained.  The alleged failure by the deputies to actually

make the inference of substantial risk of harm under the facts of this particular case does

not rise to the level of a constitutional violation when the subjective knowledge of the

risk by the jailers has not be established by Plaintiff.  Plaintiff has not created a genuine

issue of material fact as to whether the deputies *knew of and disregarded* a excessive risk.

Even if the deputies knew of the alleged risk, Plaintiff has not shown that the deputies

*subjectively* actually made the inference that medical attention was needed and

deliberately decided not to seek medical care.  Accordingly, the County deputies

involved in the second incident are entitled to summary judgment as a matter of law on

the claim of deliberate indifference to medical needs.


### 5.  Municipality Liability

In order to hold a municipality liable Mays  must show evidence "that a constitutional

deprivation was directly caused by a municipal policy." *Nadell v. Las Vegas Metro. Police

Dept.*, 268 F.3d 924, 929 (9th Cir. 2001) (citations omitted). Mays in this case has offered no

evidence of such a policy beyond conclusory statements.  Mays has produced no documents,

statements or other records from the City or County to allege an official policy to use excessive

force or to be deliberately indifferent to serious medical needs.  Lacking such evidence, Mays

can only deprive a municipality of its immunity from suit for the torts of its employees by

showing that there was a custom with the force of policy to deprive them of their rights.

Even if, as here, a plaintiff cannot show evidence of a direct policy or a widespread custom a plaintiff "may attempt to prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." *Gilette* 979 F.2d at 1349 (citing *McRae v. Shimoda*, 795 F.2d 780, 84 (9th Cir. 1986).). The Ninth Circuit established the elements that a plaintiff would have to show in order to evidence a custom through deliberate indifference:

> To impose liability on a local governmental entity for failing to act to preserve constitutional rights, a section 1983 plaintiff must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that the policy "amounts to deliberate indifference" to the plaintiff's constitutional right; and (4) that the policy is the "moving force behind the constitutional violation."

*Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting *City of Canton v. Harris*, 489 U.S. 378, 384-91 (1989). (citations omitted). What is at issue in this case is whether the policy exists and whether it amounts to deliberate indifference. The Ninth Circuit cautioned that "whether a local government entity has displayed a policy of deliberate indifference is generally a question for the jury." *Id.* at 1476. This does not mean, however, that summary judgment is never appropriate. The Ninth Circuit has also held that "a plaintiff cannot prove the existence of a *municipal* policy or custom solely on the occurrence of a single incident of unconstitutional action by a non-policymaking employee." *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir. 1989) (emphasis in original) (citations omitted). *See also Connick v. Thompson*, ___ U.S. ___, 131 S.Ct. 1350 (2011) (pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate "deliberate indifference.")

In this case Mays alleges no other incidents of unconstitutional action by the City or County officials or law enforcement officers. Even taking the evidence in the light most favorable to Mays, which is to grant that the alleged excessive force or deliberate indifference to

a medical need is in fact a constitutional violation, Mays cannot show a genuine issue of material fact for trial against the municipality. The Ninth Circuit in *Davis* directs the Court to grant a defendant's summary judgment motion when the only evidence of a policy of indifference is the plaintiff's own incident and other allegations supported by "scanty facts, little detail." *Davis* 869 F.2d at 1234.

Because Mays offers no evidence of a municipal policy or custom explicit or otherwise that the City or County officials affirmed, promulgated or were indifferent to, they retain their immunity from suit. There is no genuine issue of material fact that would warrant a trial on the claims against the municipalities and the City and County are entitled to summary judgment.


**6. State Law Claims**

Defendants argue Mays' state law claims, if any, should be dismissed. The Court agrees that pursuant with the Idaho Tort Claims Act, the municipalities and employees are immune from suit. Idaho Code § 6-904 provided "[a] governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which . . .3. Arises out of assault, battery, false imprisonment, [or false arrest]." It is a rebuttable presumption that any act or omission of an employee acting within the time and the place of his or her employment is within the course and scope of his/her employment and without malice or criminal intent. Idaho Code § 6-903(e). As to the first incident on December 23, 2006, there is no evidence presented by Plaintiff of malice or criminal intent on the part of the defendants since Plaintiff admits he did not know any of the responding law enforcement

officers and the officers had no prior knowledge of Mays to form the required malice or criminal intent. Moreover, the officers in their affidavits deny any malice or criminal intent towards Mays. Therefore summary judgment is appropriate for the responding officers and deputies as well as the City and County.

As to the second incident, the Court finds Idaho Code § 6-904B provides the exception for liability: "[a] governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent and without gross negligence or reckless, willful and wanton conduct as defined in section 6-904C, Idaho Code shall not be liable for any claim which . . .5. Arises out of any act or omission providing or failing to provide medical care to a prisoner or per in the custody of any . . . county . . . jail." Idaho Code § 6-903C defines gross negligence to include among other things, "deliberate indifference to the harmful consequences of others." This means the analysis for the exception is basically the same as the analysis of the § 1983 claim for deliberate indifference to a medical need. Because the Court having found the individual defendants were not deliberately indifferent to a serious medical need of Mays pursuant to § 1983, the state law claims also fail against the individual jailers, Sheriff Buttrey, Lt. McGee and the County.

## Order

Being fully advised in the premises, the Court hereby orders:

1) Defendants Donald Blair, City of Lewiston, Mike Rigney, Todd Stobie, Donald Blair's motion for summary judgment (Dkt. No. 107) is DENIED as to the excessive

force claim and GRANTED as to all other claims raised in the Second Amended Complaint. The claim for excessive force related to the first incident shall proceed to trial against the responding officers (Rigney, Stobie, Blair as well as Deputies Hilderbrand and Rodriguez). Claims against the City of Lewiston are dismissed.

2) Defendants Jody Brown, Dale Buttrey, Nez Perce County, Jacob Gunter, John Hilderbrand, Jaclyn Martin, Jack McGee, Gabe Richardson, Joe Rodriguez, Jamie Romer, and Rick Smith's motion for summary judgment (Dkt. No. 109) is GRANTED IN PART AND DENIED IN PART. The excessive force claim against Deputies Hilderbrand and Rodriguez shall proceed to trial. All other claims raised in the Second Amended Complaint are dismissed.

DATED: **June 1, 2011**

_____
Honorable Edward J. Lodge
U. S. District Judge